THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE TORRES, Defendant-Appellant.

First District (5th Division)   No. 1—02—2579

Opinion filed March 19, 2004.

Theodore A. Gottfried and Darrel F. Oman, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Ramune Rita Kelecius, Assistant State's Attorneys, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following a stipulated bench trial, the defendant, Jose Torres, was found guilty of two counts of aggravated unlawful use of a weapon and sentenced to serve 18 months' probation. On appeal, Torres argues that the trial court should be reversed because: (1) it erred when it denied his motion to suppress evidence because the arresting officers

had no legal justification to remove him from his vehicle, pat him down, demand his identification and conduct a name check and (2) the aggravated unlawful use of a weapon statute is unconstitutional and violates due process because it does not require a culpable mental state. For the reasons that follow, we reverse the decision of the trial court.

## BACKGROUND

Torres was charged by information with two counts of aggravated unlawful use of a weapon (UUW) under section 24—1.6(a) of the Criminal Code of 1961 (720 ILCS 5/24—1.6(a) (West 2002)). Prior to trial, Torres filed a pretrial motion to suppress evidence. In the motion, Torres claimed that the arresting officers lacked the requisite probable cause to effectuate his arrest and requested that the trial court find that his arrest was illegal and subsequently suppress the evidence. The trial court held an evidentiary hearing on the motion.

At the hearing, Officer Joe Kurpiel testified on direct examination that he and his partner were in the area of 4243 West Lawrence Avenue, in Chicago, Illinois, on February 6, 2002, at approximately 10:10 p.m. At that time, the officers were in a police vehicle and conducting a routine patrol.

As they were driving, Kurpiel testified that he saw a parked truck in a Clark gas station. In the vehicle, he saw what he characterized as a domestic altercation taking place between Torres and a woman. Kurpiel indicated that it appeared that Torres and the woman were having more than just a conversation. Kurpiel explained that he saw "hands flying" and the female "looking very submissive." When shown a copy of the police report that he made, Kurpiel testified that this information did not appear in the report.

After he and his partner approached the parked truck, Kurpiel testified that he spoke to the female passenger and his partner spoke to Torres, who was in the driver's seat. Kurpiel said that he asked the female if "everything was okay" and that she said "yes." Kurpiel said that she informed him that Torres was her boyfriend and that the two were having an argument because he had been seeing another woman. She explained that the two were trying to work things out.

Kurpiel said that he never saw Torres strike the female or do anything of that nature. Furthermore, Kurpiel testified that Torres never committed a crime in his presence. However, at this time, the two officers did not leave. By now, Kurpiel's partner had Torres out of the vehicle and was asking Kurpiel to run a name check on him. When Kurpiel ran the name check on Torres, it revealed that Torres had a warrant for driving under the influence (DUI).

The officers then placed Torres under arrest and conducted a search of his person and his vehicle. Their search revealed a gun magazine in Torres' pocket and a fully loaded and cocked handgun, which was in the console of the vehicle.

On redirect, Kurpiel testified that at the time that he asked the female passenger if everything was okay, his partner had already removed Torres from the vehicle and patted him down. He stated that this was done so that she could speak more freely to the officers. Additionally, Kurpiel said that he did not inform his partner that she had already told him that everything was all right until after he had run the name check on Torres. Kurpiel also testified that, prior to his running the name check, he did not recall his partner finding the gun clip on Torres.

Rosea Cordero testified that on February 6, 2002, at approximately 10 p.m., she and Torres were in his truck, which was parked in a Clark gas station. Cordero acknowledged that she was Torres' girlfriend and testified that she was driving his truck because Torres' license was suspended. Cordero said that she had pulled into the gas station so that she could buy some cigarettes.

She then pulled over to where the pay phones were so that she and Torres could figure out where they were going next. She said that the two were not having an argument. Cordero testified that Torres was not waiving his hands and that she did not feel threatened by him at anytime while they were sitting in the vehicle.

At this time, an unmarked police car pulled up behind them. One of the officers came over to the driver's side where she was sitting. She stated that she rolled down her window, and the officer asked her if everything was "okay." She told him "yes" and the officer then asked her for her driver's license and insurance.

The officer then asked Cordero what the two of them were doing there. He returned her license and insurance card and asked her to step out of the car. Cordero said that she was the first person to exit the truck. After she exited the vehicle, the officer made a comment about there being problems in the neighborhood with drugs and started searching the car without anyone's permission.

Torres testified that on the evening of February 6, 2002, Cordero, who was driving his truck, picked him up at his home. Torres had previously lent his truck to Cordero so that she could drive to work. At approximately 10:10 p.m., Cordero drove to the Clark gas station on Lawrence and Kildare Avenues. Torres said that while he and Cordero were in the truck, they were having a discussion regarding where they should go next. Torres said that they were not having a loud discussion and that he was not waiving his arms while they spoke. At this time, an unmarked police vehicle approached his truck.

An officer exited the unmarked vehicle, walked up to his truck, knocked on the driver's side window and asked Cordero if she was "okay." She told him "yes." The officer then asked Cordero for her license and proof of insurance. She was then asked to exit the vehicle.

At this point, another officer asked Torres to exit the vehicle as well. This officer then patted Torres down. Afterwards, the officer then began searching his vehicle, where he found a gun and a gun clip. Torres admitted that the gun belonged to him and testified that he informed the officers of this. At this point, Torres said that he was placed under arrest.

Torres testified that after the gun was found, the officers placed him in their vehicle and at that point asked him for his name. The officers then ran a name check, at which time they learned that Torres had a warrant for a DUI.

After the evidentiary hearing, the trial court denied Torres' motion to suppress the evidence. The trial court found that the officers observed a heated discussion between Torres and Cordero. The trial court also determined that the officers had a right to investigate and "to do a name check if in fact a warrant existed."

After the hearing on the motion to suppress the evidence, Torres requested to have a bench trial. Following a stipulated bench trial, Torres was found guilty of two counts of aggravated UUW and was subsequently sentenced to serve 18 months' probation. On July 2, 2002, Torres filed a motion for a new trial, which was denied. On July 23, 2002, Torres timely filed his notice of appeal.

## ANALYSIS

The issue that we must decide on review is whether the trial court erred when it denied Torres' motion to suppress the evidence.

Torres maintains that the arresting officers conducted a *Terry* stop when they approached his vehicle, stationed themselves on both sides by its doors, and ordered him to exit the truck and to subsequently identify himself. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Torres contends that the officers, who approached the vehicle because they believed that a domestic dispute was occurring, had a legal obligation to terminate the encounter as soon as Cordero informed them that she was not in any danger.

Torres contends that, after Cordero informed them that she was all right, the officers lacked a reasonable suspicion that any criminal activity was occurring or about to occur and that they simply should have left the couple alone. Torres maintains the arresting officers had no right to detain and question him after they determined that a domestic dispute was not occurring and that Cordero was not in

danger. Consequently, he argues that the officers' subsequent actions of running a name check on him, then searching his person and vehicle, amounted to an illegal search and seizure. As such, Torres argues, his constitutional rights were violated and the trial court erred when it failed to quash his subsequent arrest and to suppress the handgun and other evidence resulting from the illegal search and seizure.

■ When a reviewing court considers a ruling on a motion to suppress involving a question of probable cause or reasonable suspicion, the court should review the trial court's findings of historical facts only for clear error and must give due weight to inferences drawn from those facts. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). Consequently, the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence. *Sorenson*, 196 Ill. 2d at 431. However, we review *de novo* the trial court's ultimate determination of a defendant's legal challenge to the denial of his motion to suppress. *Sorenson*, 196 Ill. 2d at 431. The key facts pertaining to the detention and search of defendant are not in dispute. Thus, we review *de novo* whether those facts justified the denial of defendant's motion to suppress.

■ "In a motion to suppress, the burden is on the defendant to establish that the search or seizure was unreasonable or unlawful. *People v. Scott*, 249 Ill. App. 3d 597, 600, 619 N.E.2d 809 (1993). The defendant must establish a *prima facie* case that the police acted without a warrant and that the defendant was doing nothing to justify the intrusion by the police at the time of the stop or arrest. *People v. Ertl*, 292 Ill. App. 3d 863, 868, 686 N.E.2d 738 (1997). Once the defendant has made a *prima facie* showing, the burden of going forward with evidence to justify the stop or arrest shifts to the State. *People v. Drake*, 288 Ill. App. 3d 963, 967, 683 N.E.2d 1215 (1997).

■ An exception to the warrant requirement is the *Terry* stop, which is invoked here. Under *Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968), the fourth amendment to the United States Constitution permits an officer to make a valid investigatory stop of a person without probable cause to arrest when there is a reasonable suspicion of criminal activity. *People v. Branch*, 295 Ill. App. 3d 110, 112, 692 N.E.2d 398 (1998). 'For the police to justify such a detention, they must point to specific, articulable facts which, when taken together with natural inferences, make the intrusion reasonable—such as when the officer observes unusual conduct which leads him reasonably to conclude in the light of his experience that criminal activity may be afoot.' *Ertl*, 292 Ill. App. 3d at 868-69." *People v. Juarbe*, 318 Ill. App. 3d 1040, 1049-50 (2001).

■ "There are, theoretically, three tiers of police-citizen encounters. (*United States v. Berry* (5th Cir. 1982), 670 F.2d 583, 591.) One tier involves an arrest of a citizen, which action must be supported by probable cause; otherwise, the fourth amendment prohibition against unreasonable seizures is violated. (*Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.) The next tier involves a so-called '*Terry*' stop, a brief seizure that must be supported by a reasonable suspicion of criminal activity to be within acceptable fourth amendment boundaries. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) The last tier involves no coercion or detention and therefore does not involve a seizure. This tier is commonly known as the community caretaking function or public safety function. The Supreme Court elaborated on this level of police intrusion in *Terry* when it noted that '[o]bviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' *Terry v. Ohio* (1968), 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16; see also *Cady v. Dombrowski* (1973), 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528 (local police officers 'frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute')." *People v. Murray*, 137 Ill. 2d 382, 387-88 (1990). "The encounters in this tier 'involve[ ] no coercion or detention and therefore do[ ] not involve a seizure.' *Murray*, 137 Ill. 2d at 387. Accordingly, consensual encounters do not implicate the fourth amendment." *People v. Gherna*, 203 Ill. 2d 165, 177 (2003).

■ "For purposes of the fourth amendment, an individual is 'seized' when an officer ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991), quoting *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16. It is well settled that a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen. *United States v. Drayton*, 536 U.S. 194, 200, 153 L. Ed. 2d 242, 251, 122 S. Ct. 2105, 2110 (2002); *Florida v. Royer*, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983) (plurality op.). 'So long as a reasonable person would feel free "to disregard the police and go about his business," [citation], the encounter is consensual and

no reasonable suspicion is required.' *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386, quoting *California v. Hodari D.*, 499 U.S. 621, 628, 113 L. Ed. 2d 690, 698, 111 S. Ct. 1547, 1552 (1991); see also *Michigan v. Chesternut*, 486 U.S. 567, 569, 100 L. Ed. 2d 565, 569, 108 S. Ct. 1975, 1977 (1988). However, when, taking into account ' "all the circumstances surrounding the incident" ' (*Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 215, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1762 (1984), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980)), the conduct of the police would lead a reasonable innocent person under identical circumstances to believe that he or she was not 'free to decline the officers' requests or otherwise terminate the encounter' (*Bostick*, 501 U.S. at 436, 115 L. Ed. 2d at 400, 111 S. Ct. at 2387), that person is seized. Accordingly, this analysis hinges on an objective evaluation of the police conduct and not upon the subjective perception of the individual approached. *Hodari D.*, 499 U.S. at 628, 113 L. Ed. 2d at 698, 111 S. Ct. at 1551." *Gherna*, 203 Ill. 2d at 177-78.

Here, the State maintains that instead of conducting a *Terry* stop, the police were conducting a community caretaking function when they approached Torres' vehicle. Torres, on the other hand, argues that the police officers conducted a *Terry* stop when they approached his vehicle, stationed themselves beside the truck's doors, and ordered him to exit the vehicle and to identify himself.

Accordingly, we must initially determine whether a seizure occurred, or put another way, whether the arresting officers conducted what amounted to a *Terry* stop after they approached Torres' vehicle. We find that *People v. Gherna*, 203 Ill. 2d 165, 180 (2003), is very instructive.

In *Gherna*, the defendant was charged with one count of possession of a controlled substance. Prior to trial, the defendant filed a motion to suppress the evidence wherein she alleged that she was searched without a warrant and proper probable cause, which was a violation of her fourth amendment rights.

At the preliminary hearing on the motion to suppress, the following information was adduced. The two arresting officers approached a vehicle which was driven by defendant. The officers were on bicycle patrol.

At the time, the officers observed two females sitting in a pickup truck parked in an apartment complex parking lot. One of the officers testified that he and his partner were riding by the truck when he observed a bottle of beer sitting in a cup holder that was located between the two females.

The officer stated that because the passenger of the vehicle appeared to be very young, he and his partner suspected the possibility of underage drinking. He testified that he and his partner stopped to identify both of the people in the truck. Upon doing so, the officer determined that the defendant was over the age of 21 and that the passenger was the defendant's 13-year-old daughter. The officers also examined the bottle of beer and determine that it was unopened and in its original container.

After it was ascertained that no underage drinking had occurred, the officer testified that he began "casually talking" to the defendant. He observed an Illinois Link card in the name of Lowell Briggs located underneath the defendant's leg. When asked about the card, the defendant showed it to the officer. When asked where she obtained the card, the defendant said that she did not know how the card got in her vehicle and that possibly someone had dropped it there when they arrived.

At this point, the officer asked the defendant to exit the vehicle. The defendant was asked if there were any other items in the vehicle which could belong to Briggs and of which defendant was unaware. According to the officer, the defendant said that the officers were "free to look."

The officers did not search the vehicle at this time because they were still talking to defendant. She was then asked if she had anything on her that belonged to Briggs including any illegal drugs or narcotics, to which she replied "no." At this point, the defendant began emptying her pockets. As she was doing so, a clear plastic baggie fell to the ground that contained several yellowish-white rocks, which subsequently tested positive for cocaine. Defendant was then placed under arrest.

At the hearing on the motion to suppress, there was additional testimony adduced that the officers, who were on bicycle patrol, were completely outfitted in their uniforms at the time of the arrest. The officers also positioned themselves one each at the driver and passenger side doors of the defendant's vehicle.

In her motion to suppress, the defendant asserted that the officers' approach to her vehicle amounted to a *Terry* stop to investigate. She argued that after the officers determined that no underage drinking or open alcohol violation had taken place, the officers' investigation should have terminated. She contended that her continued detention by the officers after the basis for the *Terry* stop was dispelled constituted an unlawful seizure. The trial court granted the defendant's motion.

However, the appellate court reversed and remanded the matter, finding that the encounter between the officers and the defendant was

consensual and, accordingly, that the defendant's rights under the fourth amendment had not been implicated. The appellate court reached this conclusion relying on the decision reached in *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). The appellate majority found that, based on the totality of the circumstances surrounding the encounter, the defendant was not seized by the officers because a reasonable person would have believed that she was free to leave at any time. In addition, the majority rejected defendant's contention that this encounter began as a *Terry* stop and held that an officer's approach of a vehicle for the purposes of an investigation does not *per se* create a *Terry* stop. *People v. Gherna*, 325 Ill. App. 3d 157, 162 (2001).

In overturning the appellate court and determining that a *Terry* stop had indeed occurred, the *Gherna* court stated:

"Under the totality of the circumstances at bar, we conclude that the presence and positioning of the officers with their bicycles on either side of defendant's vehicle, combined with Officer Wasson's request to defendant to produce the bottle of beer for examination after questioning defendant and her daughter about their identities, constituted an official show of authority to which a reasonable innocent person would feel compelled to submit. At the time Officer Wasson asked defendant to hand him the bottle of beer, a reasonable innocent person in defendant's position would not have felt 'free to decline the officers' requests or otherwise terminate the encounter.' *Bostick*, 501 U.S. at 436, 115 L. Ed. 2d at 400, 111 S. Ct. at 2387. At that instant, defendant's movement was restricted: the positioning of the officers and their bicycles prevented defendant from either exiting the vehicle or driving the vehicle away from the scene. This blocked movement, combined with the request to examine the bottle of beer on the heels of other questioning, would ' "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." ' *Bostick*, 501 U.S. at 437, 115 L. Ed. 2d at 400, 111 S. Ct. at 2387, quoting *Chesternut*, 486 U.S. at 569, 100 L. Ed. 2d at 569, 108 S. Ct. at 1977; see also *Hodari D.*, 499 U.S. at 628, 113 L. Ed. 2d at 698, 111 S. Ct. at 1552; cf. *People v. Brownlee*, 186 Ill. 2d 501, 520 (1999) ('officers restrained the movements of [a] car's occupants by their show of authority'). Accordingly, we conclude that defendant was seized." *Gherna*, 203 Ill. 2d at 180-81.

■ In this matter, we conclude that after the arresting officers approached Torres' vehicle, they proceeded to conduct a *Terry* stop. We do not believe that the officers were merely conducting a community caretaking function as the State maintains. Like the officers in

*Gherna,* at the outset of the encounter, Officer Kurpiel and his partner positioned themselves on either side of Torres' vehicle. Torres was then asked to exit the vehicle, patted down and asked his identity. Kurpiel then asked Cordero if she was in any distress. Following the reasoning of *Gherna,* we find that the officers' conduct in positioning themselves on either side of Torres' vehicle, then demanding that he exit the vehicle and identify himself, constituted a show of their official authority such that a reasonable person in Torres' situation would not have felt free to decline the officer's request or to otherwise terminate the encounter. "A 'community caretaking' encounter between the police and a citizen involves *no coercion* or *detention,* and, consequently, does not violate the fourth amendment." (Emphasis added.) *People v. Harris,* 207 Ill. 2d 515, 522 (2003), citing *People v. Gonzalez,* 204 Ill. 2d 220, 224 (2003). In this situation, we find that a seizure indeed occurred.

Additionally we note that it is uncontradicted that the officers approached Torres' vehicle because they believed that a domestic dispute was taking place. Hence, the officers were not approaching Torres' vehicle because they believed that a stranded citizen may have been in need or to check on whether a citizen who appeared to be asleep in a vehicle on the side of the road was all right. This was not the situation in this matter. Instead, these officers approached Torres' vehicle because they believed that a crime was being committed or could potentially be committed in the near future. From Kurpiel's own testimony alone, this court could come to the conclusion that the officers were not attempting to conduct a caretaking function when they initially approached Torres and his girlfriend but instead were performing a *Terry* stop.

■ Now that we have determined that a *Terry* stop occurred, we must now consider whether it was reasonable. In order to ascertain the reasonableness of a *Terry* stop, a dual inquiry must be asked. The stop will be deemed to be reasonable if the officers' actions in initiating the stop are justified and if the officers' actions during the course of the stop are reasonably related in scope to the circumstances that justified the interference in the first place. *Harris,* 207 Ill. 2d at 522-23, citing *Gonzalez,* 204 Ill. 2d at 228, quoting *Terry,* 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.

With respect to the first inquiry, we find that the stop was justified. When the officers first approached Torres' vehicle, their observations led them to believe that they were witnessing an ongoing domestic dispute. Kurpiel stated he saw hands flying and that he saw Cordero in the vehicle "looking very submissive." Kurpiel further testified that he saw "arguing" and "yelling."

With respect to the second inquiry, we find that the officers' initial conduct was proper. The officers only approached Torres' vehicle because they believed that a domestic dispute may have been taking place. Kurpiel testified that Cordero was looking submissive. So, it is fair for this court to assume from Kurpiel's testimony that the officers believed that Cordero may have been in some sort of danger or imminent danger when they approached Torres' vehicle.

Upon reaching Torres' truck, Torres was asked to exit the vehicle by Kurpiel's partner. It was Kurpiel's testimony that Torres was asked to exit the vehicle so that Cordero could speak more freely. At this point, Kurpiel then asked Cordero if she was all right. There is conflicting testimony as to exactly what was said between Kurpiel and Cordero. However, it is uncontested that Kurpiel asked Cordero if she were all right and Cordero's response was that she was fine and not in any danger.

By now Kurpiel's partner had patted Torres down and had obtained his identity. He further requested that Kurpiel run a name check on Torres. This point in the encounter is where the officers' actions become unreasonable because they were no longer rationally related in scope to the circumstances that justified the interference in the first place.

By now Kurpiel had been told by Cordero that she was fine and not in any danger. Kurpiel had not related this information to his partner. At this time, however, his partner had requested Torres' identity and was asking Kurpiel to run a name check on Torres. Kurpiel, however, knew that Cordero was not in any danger and ran the name check on Torres anyway. The name check revealed that Torres had a warrant for a DUI. This led to a subsequent search of Torres' vehicle and person which revealed a gun and gun clip. These actions by the officers are what amounted to an illegal search and seizure and violated Torres' fourth amendment rights.

This precise issue has been considered in *People v. Harris*, 207 Ill. 2d 515 (2003). There, the defendant was charged with the unlawful possession of a controlled substance. He filed a motion to quash his arrest and suppress the evidence alleging that the arresting officer (Officer Reed) had neither a warrant to search him nor probable cause to believe that he had committed a crime. At a hearing on the motion, it was adduced that the defendant was a passenger in a vehicle that had been stopped by the police for making an illegal left turn.

When the driver was asked for his identification by the police officers, he informed them that he did not have his driver's license on his person. The driver then proceeded to give the officers a false name and birth date. This information was transmitted to the county

dispatch by the officers, and the officers subsequently learned that there was no valid driver's license for anyone by the name given to them by the driver. After confronting the driver, the officers learned the driver's real name and that his license had either been suspended or revoked.

The officers then asked the defendant for his identification. One of the officers testified that this was done with the intent to release the vehicle to the defendant if the defendant had a valid driver's license. However, at no time during the traffic stop was the defendant asked if he could drive the vehicle. The defendant's information was run through the county dispatch and it revealed that the defendant had an outstanding warrant. The defendant was then placed under arrest and searched. When the defendant was searched, the officers found cocaine on his person.

At the conclusion of the hearing, the trial court denied the defendant's motion. At trial, the defendant was found guilty of unlawful possession of a controlled substance. The defendant appealed, arguing that the trial court should have granted his motion to quash arrest and suppress evidence. The appellate court agreed and reversed the trial court. The State subsequently appealed.

The *Harris* court affirmed the appellate court's decision. Its reasoning follows:

"The warrant check performed by Officer Reed was not related to the initial justification for the traffic stop. Officer Reed initiated the traffic stop because the driver made an illegal left turn. Defendant, however, was simply the front-seat passenger in the car and was not implicated in the traffic violation. Thus, the warrant check was not directly related to the initial justification for the traffic stop. Further, the warrant check was not supported by a reasonable, articulable suspicion that defendant had committed or was about to commit a crime. Officer Reed neither saw nor suspected that defendant had committed any wrongdoing. Indeed, Officer Reed testified that at the time he requested defendant's identification, defendant was not doing anything suspicious and Officer Reed did not suspect defendant of committing a criminal offense. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we consider whether the check impermissibly prolonged the detention or changed the fundamental nature of the stop. From the record, we cannot ascertain whether the warrant check prolonged the detention. Officer Reed testified at trial that he transmitted the driver's and defendant's information to county dispatch at the same time. Some time later, county dispatch informed Officer Reed that the driver's license was either suspended or revoked. County dispatch also

informed Officer Reed that defendant had an outstanding warrant. However, Officer Reed did not testify that the warrant check performed on defendant was completed before the check on the driver. The warrant check performed on defendant could well have lengthened the duration of the detention if the officer had to wait for the results of the warrant check. Under the circumstances at bar, however, regardless of the duration of the detention, the warrant check was impermissible because it changed the fundamental nature of the traffic stop. The warrant check converted the stop from a routine traffic stop into an investigation of past wrongdoing by defendant. As Justice Murphy aptly observed in *Holt*,

> '*Terry*'s scope requirement is a common sense limitation on the power of law enforcement officers. It prevents law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing, absent an independent basis for reasonable articulable suspicion or probable cause.' *United States v. Holt*, 264 F.3d 1215, 1240 (10th Cir. 2001) (Murphy, J., concurring in part and dissenting in part)." *Harris*, 207 Ill. 2d at 526-28.

■ Here, as in *Harris*, the identification check or warrant check that the officers performed on Torres converted the initial *Terry* stop from a routine stop into an impermissible investigation of past wrongdoing that the defendant may have possibly committed. Before Kurpiel decided to run the name check, he knew that Cordero was not in any danger. This was the only reason that the officers decided to stop this couple in the first place, to determine if she was in or potentially in harm's way. We reiterate that these officers only approached Torres' vehicle because they believed that a domestic dispute may have been taking place.

We also note, however, that the couple may have been in the middle of an innocuous animated discussion about a topic of great interest to both of them. They were in an enclosed vehicle. Kurpiel testified that he "saw" arguing and yelling. However, he never testified that he heard any part of the of the couple's conversation. There was no evidence of grabbing, pushing, hitting or shoving between the couple. All of a sudden, Torres finds himself outside of his vehicle, being patted down by a police officer and asked for his identification. Never once being told why. Although this is not a determinative factor in this matter, we do take note of this.

After Kurpiel was informed by Cordero that Torres posed no danger to her, the officers should have left this couple alone. Instead, the officers pushed ahead and ran a name check on the defendant. Police officers in this type of situation are not allowed to run a general

inquisition. This was impermissible and violated Torres' constitutional rights. *Harris*, 207 Ill. 2d at 526-28. As such, this matter is reversed.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is reversed.

Reversed.

CAMPBELL, P.J., and O'BRIEN, J., concur.