THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUCAS T. ROBERTS, Defendant-Appellant.

Fourth District   No. 4—02—0613

Opinion filed June 30, 2004.—Modified on denial of rehearing August 4, 2004.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Jerry J. Hooker, State's Attorney, of Mt. Sterling (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Following a stipulated bench trial in May 2002, the trial court found defendant, Lucas T. Roberts, guilty of unlawful possession of cannabis with intent to deliver. 720 ILCS 550/5(c) (West 2000). The trial court sentenced defendant to 24 months' probation. Defendant appeals the trial court's denial of his motion to suppress, arguing the deputy exceeded the scope of his authority by questioning defendant about possible criminal activity after the traffic stop was completed. We reverse the court's denial of defendant's motion to suppress and vacate the judgment of conviction.

## I. BACKGROUND

At the hearing on the motion to suppress in December 2001, deputy sheriff Michael Scott Hainline testified to the following. On August 25, 2000, Hainline was assigned to routine traffic patrol in Brown County. As a significant part of his training for traffic duties, he testified, he had undergone drug interdiction training. Hainline testified that this training taught him to go "beyond the initial traffic stop" and to ask different questions and to look for different answers or nonresponsiveness, to observe the body language of passengers, to look for movement within the passenger compartment, and how to identify different types of drugs and drug paraphernalia. In addition to teaching him to identify situations in which a further search may be warranted, the classes taught him techniques to effectuate that search in a manner that would reduce the level of constitutional scrutiny.

At 4 a.m. on August 25, as Hainline was driving eastbound along US Route 24, he noticed in his side mirror that defendant's westbound car that he had just passed did not have a working registration light. Hainline turned his car around, switching from the eastbound lane to the westbound lane, and upon confirming that the car did not have a working registration light, pulled the car over. As he initiated his squad car's overhead lights, "take-down" lights, and spotlights, Hainline observed movement in the vehicle and noted that it appeared that there were three subjects in the vehicle. Hainline admitted the movement was not unusual.

After stopping the car, Hainline approached the vehicle on the passenger side. Hainline testified that the passenger in the front seat initially looked surprised that he had come up on his right instead of on the driver's side. Hainline then introduced himself, stated the

reason for the stop, and asked the driver of the car for his license and proof of insurance. He also asked for identification from the passengers, Adam Heather in the front seat and Walter Bartz in the rear. Hainline testified that Heather did not directly look at him, except to answer questions about his identity and birth date, but instead looked straight ahead when he was not speaking. Hainline characterized this behavior as suspicious under the "no look test," saying that most passengers will look at the officer just as a show of respect and that it is suspicious if a passenger tries to ignore the officer or pretend that he is not there. Conversely, Hainline testified that Bartz, the passenger in the rear seat, was overly friendly, which also was suspicious behavior. As he was talking to the vehicle's occupants, Hainline smelled a strong odor, although he could not identify the scent, but it could have been food. Hainline testified that a strong odor, even if the smell could not be identified, was often indicative of the masking of drugs or drug use in the car.

Hainline took the information he had received and returned to his patrol car to check that defendant's driver's license was valid and to run a warrant check on everyone in the vehicle. He found that both Heather and Bartz had criminal histories, but defendant had none. Additionally, Hainline testified that he had previously received information from the West Central Illinois Drug Task Force that Heather was involved in illegal drug activity. However, defendant had a valid driver's license and proof of insurance, and there were no outstanding warrants for any occupant, so Hainline exited his patrol car and approached the vehicle, this time from the driver's side. Hainline then asked defendant to exit his car and to join him at the rear of the car. Defendant complied, and Hainline talked briefly with him while he wrote out a warning ticket. Hainline asked him where they were coming from and what they were doing. Defendant answered that they had been at a friend's house in Beardstown. When asked the name of the person they had visited, defendant did not answer. Hainline then issued the warning ticket to defendant and returned his insurance card and driver's license, informing him that he was free to go.

There is some dispute as to whether defendant reentered the vehicle and was about to leave or whether he was simply returning to the vehicle. After he had received his warning ticket, driver's license, and insurance card, Hainline asked him if they had any open alcohol in the vehicle. Defendant replied in the negative. Hainline asked him if there were any loaded guns in the car. Defendant answered no. Hainline asked if there were any illegal drugs in the car. Defendant testified he said no. However, Hainline testified that defendant did not

provide an answer, but instead looked down and away from him. Hainline then asked for permission to search the vehicle. Hainline testified that the reason he waited to question defendant about the contents of his vehicle until after he had returned his license and told him he was free to go was to prevent defendant from saying at trial that he did not feel he was free to leave at that moment.

Defendant testified that he did not initially consent, but after Hainline told defendant that he could keep them there until they consented or he brought in a canine to search, defendant eventually consented. Hainline denied telling them that he could keep them there until they consented. However, Hainline admitted that he may have said other units, including perhaps a canine unit, were in the area and could be on their way. Hainline testified that he did this, not as an intimidation, but out of concern for his own safety, as he was outnumbered three to one.

After Hainline received consent to search the car, he ordered the passengers out and frisked each of them, finding no weapons or contraband. He then opened the passenger side door and began a vehicle search, which resulted in his finding a "one-hitter" pipe and a large bag of plant material, which later field tested positive for cannabis.

The trial court denied defendant's motion to suppress, finding that (1) the initial traffic stop was permissible, (2) a reasonable person in defendant's position would believe he was free to leave, (3) the detention was not improperly prolonged, and (4) Hainline had reasonable suspicion to ask for consent to search.

Following a stipulated bench trial, defendant was found guilty of unlawful possession of cannabis with intent to deliver. Defendant filed a posttrial motion, arguing the trial court erred in denying his motion to suppress. On July 26, 2002, the court denied defendant's posttrial motion and sentenced defendant to 24 months' probation. This appeal followed.

## II. ANALYSIS

### A. Standard(s) of Review

■ When a trial court's ruling on a motion to suppress involves factual determinations or credibility assessments, the court's ruling will not be disturbed on review unless it is manifestly erroneous. *People v. Gonzalez*, 204 Ill. 2d 220, 223, 789 N.E.2d 260, 263 (2003). However, where the facts and witness credibility are not in dispute, the ultimate question posed by the legal challenge to the trial court's ruling is reviewed *de novo*. *Gonzalez*, 204 Ill. 2d at 223, 789 N.E.2d at 263. In the present case, the trial court found a reasonable person in

defendant's position would have believed he was free to leave. The State argues this is a question of fact, and, therefore, it will only be reversed if it is against the manifest weight of the evidence. The State correctly cites *People v. Smith*, 266 Ill. App. 3d 362, 367, 640 N.E.2d 647, 650 (1994), for the proposition that "[a] reasonable person may voluntarily comply with an officer's mere request, but would not 'feel free to decline' an officer's order. As a result, the trial court must decide as a question of fact whether a reasonable person in the defendant's position would have felt free to decline the officer's request in a given factual situation." However, in the instant case, all parties concede that whether Hainline had a reasonable suspicion to temporarily detain defendant is a question of law reviewed *de novo*. Only the underlying facts and witness credibility are subject to the manifestly erroneous standard of review. We, therefore, accept the trial court's finding of facts, which follow, because they were not manifestly erroneous.

"The officer had given [defendant] back all of his documentation, told him he was free to go, and then said, [']by the way, can I [search the car?'] And not any great amount of time had passed when that had occurred, just a matter of less than minutes, unlike the *Brownlee* case. And unlike the *Brownlee* case, [defendant] did not say to the officer, [']do I have a choice?['] And the officer had reason to ask for a consent to search, and the reason was that, perhaps not totally objective standards of eye contact, movement, unidentifiable odor, which probably could have been sweat socks, the name of the passenger who had a criminal record and whose name had been made known to the officer by members of the Drug Task Force, and the driver's inability to provide the name of friends that were visiting."

## B. Denial of Motion To Suppress

■ In *People v. Harris*, 207 Ill. 2d 515, 802 N.E.2d 219 (2003), the Illinois Supreme Court addressed the parameters within which a police officer must operate when a motorist is stopped for a traffic offense. Relying on *Gonzalez*, the supreme court stated that a vehicle stop constitutes a seizure of the vehicle's occupants and is, therefore, subject to the fourth amendment's requirement of reasonableness. *Harris*, 207 Ill. 2d at 522, 802 N.E.2d at 224, citing *Gonzalez*, 204 Ill. 2d at 226, 789 N.E.2d at 266. In determining the reasonableness of a traffic stop, courts are guided by the supreme court's observation that the usual traffic stop is more analogous to a *Terry* investigative stop than to a formal arrest. *Harris*, 207 Ill. 2d at 522, 802 N.E.2d at 224-25, citing *Gonzalez*, 204 Ill. 2d at 226, 789 N.E.2d at 266. Therefore, as a general rule, a fourth amendment challenge to the reasonableness of a traffic stop is analyzed under *Terry* principles.

In accordance with *Terry*, a police officer may briefly detain an individual for questioning, absent probable cause to arrest, if the officer has a reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968). However, if a detention exceeds what is permissible as a *Terry* investigative stop, a later consent to search may be found to be tainted by the illegality. *People v. Brownlee*, 186 Ill. 2d 501, 519, 713 N.E.2d 556, 566 (1999).

A *Terry* analysis includes a dual inquiry: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *Harris*, 207 Ill. 2d at 522-23, 802 N.E.2d at 225, citing *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266, quoting *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. With respect to the first inquiry, defendant concedes that the vehicle stop in this case was justified at its inception. With respect to the second inquiry, we must consider whether Hainline's questioning of defendant was reasonably related in scope to the circumstances that justified the stop in the first place. If so, no fourth amendment violation occurs. *Harris*, 207 Ill. 2d at 523, 802 N.E.2d at 225, quoting *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. If the questioning was not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the questioning. If the questioning is so justified, no fourth amendment violation occurs. *Harris*, 207 Ill. 2d at 523, 802 N.E.2d at 225, quoting *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. Absent a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, " 'we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop.' " *Harris*, 207 Ill. 2d at 524, 802 N.E.2d at 225, quoting *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270.

In *Harris*, the supreme court clarified its holding in *Gonzalez*, finding a passenger warrant check unreasonably prolonged a traffic stop. In *Harris*, the court found that the warrant check was not directly related to the initial justification for the traffic stop, and the warrant check was not supported by a reasonable, articulable suspicion that defendant committed or was about to commit a crime. Therefore, *Harris* found the warrant check changed the fundamental nature of the stop. *Harris*, 207 Ill. 2d at 528, 802 N.E.2d at 228.

The First District recently applied the *Harris* reasoning in *People v. Torres*, 347 Ill. App. 3d 252, 265, 807 N.E.2d 654, 666 (2004), and found the trial court erred in denying the defendant's motion to sup-

press. In *Torres*, two police officers approached both sides of the vehicle after witnessing what they believed to be a domestic altercation. While Officer Kurpiel asked the female occupant if she was alright, his partner asked the defendant to exit the vehicle, where he was asked his name. *Torres*, 347 Ill. App. 3d at 254, 807 N.E.2d at 657. The female passenger told Kurpiel there was no problem and she was not in danger. The *Torres* court stated that at this point, the purpose for the stop was over. However, the officers continued to hold them and ran a warrant check on the defendant, learning he had an outstanding warrant for driving under the influence. *Torres*, 347 Ill. App. 3d at 254, 807 N.E.2d at 657.

Applying *Harris*, the First District found the warrant check on the defendant converted the initial stop from a routine stop into an impermissible investigation of past wrongdoing. *Torres*, 347 Ill. App. 3d at 265, 807 N.E.2d at 666. The court emphasized that when the officers ran the warrant check on the defendant, they knew that the female passenger was not in danger, and therefore, the only reason for the officers' stop was resolved. Further, the officers had no additional suspicion of criminal activity, and therefore, no justification warranted the prolonged detention.

■ Applying *Harris* to the facts in the instant case, we find that under these circumstances, a reasonable person would not have felt free to leave, and Hainline did not have reasonable suspicion to detain defendant as a matter of law. We, therefore, reverse.

At issue in the instant case is whether the trial court erred in denying defendant's motion to suppress, finding (1) a reasonable person in defendant's position would have believed he was free to leave after the warning citation was issued and defendant's driver's license and insurance card were returned and (2) defendant was not unconstitutionally seized when Hainline questioned defendant after the traffic stop was complete.

Both parties acknowledge that the traffic stop was complete once Hainline returned defendant's driver's license and insurance card and handed defendant the warning citation. Defendant argues, however, that Hainline's later questions a second or two after the traffic stop was complete would make a reasonable person believe that the traffic stop was not complete and that he was not free to leave. We agree with defendant.

As in *Harris*, the check here converted the stop from a traffic stop into an investigation of past wrongdoing by not just defendant but also his passengers. While Hainline's request for identification from defendant and his passengers was facially innocuous (*Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270), Hainline's later warrant check was

not based upon a reasonable suspicion. Nothing indicated any crime—only an indistinguishable smell, a friendly passenger, and an unfriendly passenger. Upon request for identification of everyone in the car, Hainline recognized Heather as someone the West Central Illinois Drug Task Force had indicated was involved in illegal drug activity. These facts, even in combination with the strong unidentifiable odor, are not enough to establish a reasonable, articulable suspicion of criminal activity to support a warrant check on the passengers. Therefore, the warrant check impermissibly prolonged the detention and changed the fundamental nature of the stop.

For these reasons, we are constrained to follow *Harris*. However, we feel compelled to recognize Justice Fitzgerald's comments in the dissent.

> "Conducting a non[ ]intrusive computerized check to determine if a judge has commanded the arrest of the passenger cannot reasonably be deemed a 'general inquisition.' The majority's conclusion to the contrary effectively creates a constitutional right to avoid justice.
>
>     \*\*\*
>
> Under the court's present analysis, a warrant check will only comport with *Terry*'s scope requirement if it is either related to the purpose of the stop, or supported by a reasonable, articulable suspicion of criminal conduct. A warrant check, however, will rarely, if ever, relate to the purpose of a routine traffic stop—issuing a warning or citation for an observed traffic violation. Nor will facts necessarily develop during a routine stop providing a reasonable, articulable suspicion of criminal conduct. Although the present case involves a passenger, rather than the driver, the same *Terry* principles that govern the reasonableness of the officer's encounter with the passenger, also govern the reasonableness of the officer's encounter with the driver. Accordingly, under the majority's opinion, a driver can now legitimately argue that a warrant check 'change[s] the fundamental nature of the traffic stop' by converting the stop 'into an investigation of past wrongdoing.' [Citation.]"
> *Harris*, 207 Ill. 2d at 538-39, 802 N.E.2d at 233-34 (Fitzgerald, J., dissenting, joined by Thomas and Garman, JJ.).

While we agree with Justice Knecht's special concurrence, we nonetheless must follow the supreme court's majority in *Harris*. Therefore, we reverse the trial court's denial of the motion to suppress and vacate defendant's conviction.

## III. CONCLUSION

For the reasons set forth above, we reverse the trial court's denial

of defendant's motion to suppress and vacate the judgment of conviction.

Reversed and vacated.

PRESIDING JUSTICE KNECHT, specially concurring:
I concur in the result and commend Justice Myerscough for citing Justice Fitzgerald's comments in dissent to *Harris*. I write separately because I believe the decision in *Harris* is not required by the fourth amendment.

*Harris* is an invitation for officers to jot down the license holder's name or memorize it and run a warrant check *after* the traffic stop has concluded and the vehicle has departed. Does the conduct of the officer after the vehicle *departs* fundamentally change the nature of the stop that occurred but has concluded? Will a later rule prohibit the officer from writing down the occupant's name and checking it later? Will the officer who has a photographic memory have the advantage because he need not write down pertinent details but simply memorize them for later use?

A passenger warrant check is an effective means of locating individuals for whom a judge has issued a warrant. This is not an intrusion. An officer who does not do a warrant check of passengers of a vehicle lawfully stopped at 4 a.m. on a summer night in the circumstances present here is not doing his or her job. A cursory review of appellate cases shows warrant checks on passengers are effective, and those same cases do not show officers abusing their authority, prolonging traffic stops interminably, or attempting to manufacture evidence to justify their conduct.

Common sense suggests brief information gathering using a computer does not prolong the detention or change the nature of the stop. The officer was not seeking evidence of wrongdoing—the officer was checking information. The officer's candor about his training in techniques to conduct a search of a vehicle so as to reduce the level of constitutional scrutiny should not make his every question or action suspicious or impermissible.

It is now permissible to search and even dismantle a car's gas tank as part of drug and other smuggling interdiction at the nation's borders. This is so *even* absent any particular reason to suspect that car. It can be done at random. *U.S. v. Flores-Montano*, 541 U.S. 149, 154-55, 158 L. Ed. 2d 311, 317-18, 124 S. Ct. 1582, 1587 (2004). Such a ruling permits trampling the rights of innocent travelers. I do not endorse the ruling, but it defies logic that such a search would be permissible, and yet an officer is forbidden from running the license

and identification information of a passenger in a lawfully stopped vehicle.

JUSTICE COOK, specially concurring:

There is a difference between asking a driver for identification and asking a passenger for identification. A driver is required to have a current license as a condition of operating a vehicle. Asking a driver for his license is reasonably related to the initial justification for the stop. Usually there is no reason to ask a passenger for identification. Asking a passenger for identification suggests the stop is pretextual, and the real purpose is a general inquisition about past, present, and future wrongdoing. The court in *Gonzalez* and *Harris* struck a balance. A simple request for identification from a passenger is allowed, but the routine running of warrant checks on passengers is not. I agree with those decisions. If a balance cannot be struck, if a police officer must be allowed to run a warrant check on every piece of identification that comes into his possession, we should straightforwardly recognize that the fourth amendment affords no protection against vehicle stops and searches. See *People v. Ortiz*, 317 Ill. App. 3d 212, 226, 738 N.E.2d 1011, 1022 (2000) (Cook, P.J., specially concurring).