THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY G. HESS, Defendant-Appellant.

Fourth District   No. 4—99—0643

Argued May 24, 2000.—Opinion filed June 22, 2000.

McCULLOUGH, J., dissenting.

Daniel D. Yuhas and Arden J. Lang (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Matthew L. Sullivan, State's Attorney, of Paris (Norbert J. Goetten, Robert J. Biderman and James C. Majors (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In November 1998, the State charged defendant, Timothy G. Hess,

with one count of unlawful manufacture of 30 to 500 grams of cannabis (720 ILCS 550/5(d) (West 1998)) and three counts of unlawful possession of weapons by a felon (720 ILCS 5/24—1.1(a) (West 1998)). In January 1999, defendant filed a motion to suppress evidence, which the trial court denied. In July 1999, the State dismissed the weapons charges. Following a stipulated bench trial, the court convicted defendant of unlawful manufacture of more than 10 but not more than 30 grams of cannabis and later sentenced him to one year in prison.

Defendant appeals, arguing that the trial court erred when it denied his motion to suppress evidence because (1) his consent to a search of his home was the fruit of an illegal detention; and (2) his statements to the police were made (a) while he was illegally detained, and (b) without the benefit of *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)). We agree with defendant's first argument and reverse.

## I. BACKGROUND

The evidence presented at the hearing on defendant's motion to suppress showed the following. On November 12, 1998, at about 3 or 3:30 in the afternoon, approximately 15 members of the Illinois State Police Tactical Response Team (Response Team) arrived at the residence of Richard Simmons in Kansas, Illinois, to execute a search warrant. The police also had a warrant for Simmons' arrest and had been informed that (1) he was a felon in possession of a firearm, (2) his residence might be booby-trapped, and (3) he might be high on methamphetamine. Several local police officers assisted the Response Team.

On that day, defendant was at Simmons' home for a social visit and to check on his truck, which Simmons was repairing for him. As Simmons and defendant sat at the kitchen table, they heard a car pull up and Simmons' dogs start to bark. Simmons got up to see what was happening and went out the back door. Defendant started toward the back door when he heard a voice yelling, "Come out of the house. You in the house, out of the house, now." He heard six or eight voices screaming. A police officer toting a submachine gun confronted defendant at the back door, and defendant urinated in his pants out of fright. The officer yelled at defendant to get out of the house and onto the ground. He also yelled, "Don't look at me. Look the other way," and shouted questions at defendant about booby traps. The officer forced defendant to his knees, then his belly, and then spread-eagled and searched him. Simmons was promptly taken away in a police car.

Defendant testified that the police kept him lying handcuffed facedown in the dirt for 15 to 20 minutes while an armed officer stood over him. Defendant was wearing a T-shirt and jeans and testified that

he was cold and scared. He had no idea what was going on. Later, the officer lifted defendant off the ground and had him sit on what was described at the hearing as a "stump" by some witnesses and an industrial "spool" by others (hereinafter stump) for another 15 to 20 minutes. A member of the Response Team testified that defendant was only facedown on the ground while he was being frisked and was moved over to the stump after sitting on the ground for only a few minutes.

T.R. Todd, an investigator with the Edgar County sheriff's department, arrived while defendant was sitting on the stump. Defendant felt reassured upon seeing Todd because he had known him for about 15 years. Shortly after Todd arrived, a police officer told defendant that he was going to take him over to the "man in the down coat," meaning Todd.

Defendant described his first conversation with Todd as follows:

> "[Todd] asked me what was going on. I said, 'I don't know what's going on.' He says ***, 'Are you involved in this?' I said, 'I don't know what you're talking about.' He goes, 'Well, we're going over to your house next.' And I said, 'For what?' He goes, 'Well, if you got anything going on, you better tell me right now. 'Cause you can go over there, you can show me what you got, or we can go over there and tear hell out of things and find it ourselves. We're going over there, either way.' That's just what he told me."

According to defendant, Todd was angry and yelling throughout this exchange. Todd indicated that Simmons was involved in the production of methamphetamine. He asked defendant what he had at his house, and defendant told him that he might have "a little pot." Todd told defendant that if it was for defendant's own personal use he would not "do anything about it." Defendant subsequently signed a consent-to-search form authorizing a search of his residence. A police officer then drove defendant to his residence, where the evidence against defendant was found. Defendant was subsequently arrested and charged as stated.

At the hearing, Todd denied that he threatened to search defendant's house even if defendant declined to consent to the search. A notation on the consent-to-search form indicates that defendant signed it at 4:35 p.m.

At the close of the hearing, the trial court granted defendant's motion to suppress regarding statements he made without the benefit of a *Miranda* warning, but in all other respects, the court denied the motion to suppress. Specifically, the court found that defendant had voluntarily consented to the search of his residence.

Following a stipulated bench trial, the trial court convicted defendant and sentenced him as stated. This appeal followed.

## II. ANALYSIS

The question raised by this appeal is whether the length of the defendant's detention at Simmons' residence was in violation of the fourth amendment of the Constitution of the United States (U.S. Const., amend. IV). If so, defendant's consent to search his home was tainted as a "fruit of the poisonous tree." Because the trial court determined that defendant voluntarily consented to the search of his residence, the court, by implication, found that defendant was lawfully detained at the time. We disagree.

■ A trial court's ruling on a motion to suppress evidence will not be reversed unless it is manifestly erroneous. *People v. Wells*, 182 Ill. 2d 471, 481, 696 N.E.2d 303, 308 (1998). A person is "seized" for fourth amendment purposes when " 'by means of physical force or a show of authority,' that person's 'freedom of movement is restrained.' " *People v. Brownlee*, 186 Ill. 2d 501, 517, 713 N.E.2d 556, 564 (1999), quoting *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). The fourth amendment applies to all seizures, even those that involve only a brief detention short of a traditional arrest. *Brownlee*, 186 Ill. 2d at 518, 713 N.E.2d at 565.

■ Brief detentions, or "limited investigatory stops," are "permissible only upon a reasonable suspicion based upon specific and articulable facts that the person has committed, or is about to commit, a crime." *Brownlee*, 186 Ill. 2d at 518, 713 N.E.2d at 565. An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the detention. When a detention outlives its justification, a subsequent consent to search may be tainted by the illegal detention. *Brownlee*, 186 Ill. 2d at 519, 713 N.E.2d at 565.

■ In *Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), the Supreme Court held that police may detain persons found at the premises named in a search warrant, provided that (1) the warrant authorizes a "search for contraband" and (2) the persons detained are "occupants" of the premises. *Summers*, 452 U.S. at 705, 69 L. Ed. 2d at 351, 101 S. Ct. at 2595. The word "occupant" is construed literally in this context, meaning that it is virtually synonymous with the word "resident." 2 W. LaFave, Search & Seizure § 4.9(e), at 650 (3d ed. 1996). Thus, the police do not have unbridled authority to subject persons to lengthy detentions who merely happen to be on the premises when a search warrant is executed. See, *e.g.*, *Heitschmidt v. City of Houston*, 161 F.3d 834 (5th Cir. 1998) (Heitschmidt's fourth amendment rights were violated when he was detained for 4½ hours while police searched his residence and the police had no reason to believe that he was involved in the crime they were investigating).

Cases involving the detention of individuals present during the execution of a search warrant call for examination of both the character of the official intrusion and its justification. *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 348-49, 101 S. Ct. at 2593. We recognize that the execution of a warrant to search for contraband "is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and the risk of harm to both the police and anyone present is minimized if the officers are free to exercise "unquestioned command of the situation." *Summers*, 452 U.S. at 702-03, 69 L. Ed. 2d at 349-50, 101 S. Ct. at 2594. Nevertheless, "[a] seizure based upon probable cause that is reasonable when it commences may become unreasonable as a result of its duration or other circumstances." *People v. McArthur*, 304 Ill. App. 3d 395, 398, 713 N.E.2d 93, 95 (1999) (citing *Segura v. United States*, 468 U.S. 796, 812, 82 L. Ed. 2d 599, 613, 104 S. Ct. 3380, 3389 (1984)), *cert. granted*, No. 99—1132 (May 1, 2000). Such is the case here.

Defendant does not contend that his initial detention was unlawful, only that its length exceeded constitutional bounds. The State responds that *Terry* (*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) stop principles (which govern limited investigatory detentions) do not apply in this case because the police had the authority to detain defendant pursuant to section 108—9 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/108—9 (West 1998)). We agree with defendant.

Section 108—9 of the Code reads as follows:

> "In the execution of the warrant the person executing the same may reasonably detain to search any person in the place at the time:
> (a) To protect himself from attack, or
> (b) To prevent the disposal or concealment of any instruments, articles[,] or things particularly described in the warrant." 725 ILCS 5/108—9 (West 1998).

Section 108—9 of the Code, however, does not render a detention lawful that otherwise violates the fourth amendment. See *People v. Merriweather*, 261 Ill. App. 3d 1050, 1054, 634 N.E.2d 361, 364 (1994) (section 108—9 of the Code does not authorize the search of any person who happens to be on the premises when a warrant is executed; probable cause or a sufficient connection to the premises is required). Moreover, the State's argument fails to address the pivotal question this case presents: that is, whether the length of defendant's detention extended beyond its justification.

■ When the police ordered defendant out of the Simmons residence, they had no evidence that he was connected to Simmons, the

premises, or the objects of the search. They also had no warrant for his arrest. For all they knew, defendant was at Simmons' home to make a delivery, borrow a tool, or sell candy for charity. Their only justification for holding defendant was to minimize the risk of harm to the officers executing the warrant or to prevent him from destroying evidence.

The State argues that the nature of the search warrant and the information they had about Simmons—namely, that they were on a search for contraband, Simmons had weapons, and Simmons might have been high on methamphetamine—justified detaining defendant. To a point, we agree with the State. The police must be free to exercise their discretion to control the environment when facing dangerous circumstances, such as the execution of the search warrant in this case. Initially, in the interest of safety and pursuant to section 108—9 of the Code, the police here did have the authority to use appropriate force to safely secure the premises, including detaining defendant as they did. Once that was accomplished, however, any justification for continuing to detain defendant ceased to exist.

We disagree with the State's contention that the police were justified in detaining defendant until they completed the search of Simmons' residence. The determination of what is a reasonable detention is fact specific. Although, under some circumstances, officer safety might compel the detention of a seemingly unconnected individual until a search is completed, this is not such a case. Here, 15 to 20 police officers encountered 2 potential suspects, one of whom (Simmons) was promptly whisked away. This case is distinguishable from a "crack house" raid, where a handful of officers encounter 10 or 20 people in a confined space and must maintain control of those present to ensure officer safety and the preservation of evidence.

The police here determined rather quickly that defendant was not armed. He was detained outside the Simmons residence, which subsequently was swarming with police officers. Because no reason existed to believe that defendant might reenter the house to thwart the search or destroy evidence, no reason existed for not sending defendant on his way once (or, at most, shortly after) the police secured the Simmons residence. Certainly, no circumstances concerning defendant justified detaining him for an additional 15 to 20 minutes, let alone 30 to 40 minutes. Simply put, the police vastly exceeded the justifiable scope of defendant's detention.

We note that the State's contention—that the police were justified in detaining defendant until they completed the search of Simmons' residence—is essentially open-ended. Depending upon the thoroughness of the search, execution of the search warrant here might have

taken several hours to complete. All, apparently, as defendant was detained outside by other officers.

Moreover, the record indicates that once defendant consented to a search of his residence, the police made him accompany them there, even though the search of the Simmons residence was still ongoing. Thus, the State is essentially asking us to hold that the police were justified in detaining defendant at the Simmons residence even after they determined that they had no need to detain him there. We decline to do so.

The State further argues that defendant's detention did not taint his consent because he was not actually detained when he signed the consent-to-search form. According to the State, defendant had been "released" after about 20 minutes and then voluntarily spoke to Todd. Nothing in the record, or the trial court's findings, however, supports the State's spin on the evidence.

In *Brownlee*, the police unlawfully detained a car and its passengers (with a minimal show of authority) for only a few minutes before they obtained the driver's consent to search the vehicle. The supreme court held that the driver's consent was the fruit of the illegal detention and therefore invalid. *Brownlee*, 186 Ill. 2d at 520-21, 713 N.E.2d at 565-66. Considering the extreme circumstances of defendant's unlawful detention, we reach the same result. The trial court's conclusion, therefore, that defendant's consent under these circumstances was legally valid, was manifestly erroneous.

Accordingly, we hold that (1) defendant was illegally detained when he gave the police consent to search his residence; (2) the illegal detention tainted his consent; and (3) the trial court erred by denying defendant's motion to suppress the evidence found at defendant's home. Because we have concluded that the trial court should have suppressed the only evidence of defendant's guilt, we reverse his conviction and need not remand for further proceedings.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.

Reversed.

KNECHT, J., concurs.

JUSTICE McCULLOUGH, dissenting:

I respectfully dissent. The majority finds that the trial court erred when it denied defendant's motion to suppress evidence because his consent to a search of his home was the fruit of an illegal detention.

To reverse the trial court's ruling, it appears the majority disagrees with the trial court on credibility issues. State Trooper Roll testified that he was a member of the Response Team. The team first took Simmons into custody and noticed another subject, defendant, in the porch area. Police ordered defendant to the ground and, according to Roll, he was on the ground just long enough to put the handcuffs on him and to check defendant's pockets, "a couple minutes." Defendant was then walked over to and sat upon a stump, which, according to the trooper, was for defendant's comfort. Defendant was in handcuffs for about 15 minutes for the reason that "the house had not been cleared yet. The intelligence that had been gathered was that there was some possibly [sic] booby-traps in the yard, in the shed, in the residence. So at that time we just had the subject secured for their [sic] safety as well as our own, until the house was totally cleared and the yard was cleared." The team leader makes the determination that the house is cleared, "usually made over our radio." "At that point I unhandcuffed Mr. Hess, and I advised him that other officers would be taking care of him."

Officer Todd, of the Edgar County sheriff's department, testified that he talked to defendant and told defendant that he would like to talk to him "after the response team had finished their work and after he was unhandcuffed." Todd further testified that he had no intention of arresting defendant, defendant never indicated that he was in discomfort, and defendant rode in the front seat with Officer Wilson to defendant's residence some three miles away. Officer Wilson testified that, if defendant were in custody, he would have been in handcuffs and been in the backseat. Officer Wilson did not smell urine as they rode in the car. Defendant testified that he lived approximately four to five miles south of Kansas, he was handcuffed while the house was being secured and searched, and that he was handcuffed "[f]or [his] own protection."

I agree with the majority that "[a]n investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the detention." 314 Ill. App. 3d at 310. In *Heitschmidt*, the detention was 4½ hours. As stated, in the interest of safety and pursuant to section 108—9 of the Code, the police have the authority to use appropriate force to safely secure the premises, including detaining defendant.

The trial court heard the testimony of all the witnesses, had the benefit of written authority, and entered a five-page letter setting out its findings and decision. I suggest that *Brownlee, Summers, Heitschmidt*, and section 108—9 of the Code support the ruling of the trial court.

I would affirm the trial court in its rulings.