THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CALVIN CONNER, Defendant-Appellant.

First District (4th Division)    No. 1—03—1627

Opinion filed June 30, 2005.

Michael J. Pelletier, Oren B. Golan, and Ann C. McAllister, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica

Calderon Malavia, and Michael J. Sorich, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a bench trial, defendant Calvin Conner was found guilty of unlawful use of a weapon by a felon and sentenced to two years' imprisonment. On appeal, he contends that the trial court erred in denying his motion to quash arrest and suppress evidence because the officers unconstitutionally detained him while executing a search warrant. For the following reasons, we affirm.

Prior to trial, defendant filed a motion to quash his arrest and suppress evidence, alleging that he was arrested without probable cause and asking the court to suppress the evidence and his statement acquired as a result of his illegal arrest. At the hearing, Chicago police officer Brian Ladd testified that on January 3, 2002, he executed a search warrant for Terrance Carter at 6646 South Bell Street in Chicago, Illinois. It is clear from the record that the search warrant at issue authorized a search of the premises at 6646 South Bell and the person of Terrance Carter for narcotics.[1] Officer Ladd testified that other officers who were part of his team simultaneously executed a

---

[1]Although this warrant is not contained in the record on appeal, the transcript clearly indicates that it is a search warrant, number 02 SW 6114, for the Bell Street premises and Carter. Defendant never challenged the validity of the search warrant in the trial court, nor has he challenged its validity here. In fact, defendant used the search warrant during the hearing on his motion to suppress, referring to it as "Defendant's Exhibit No. 1 for Identification." This court ordered both parties to supplement the record with the search warrant, but neither was successful in securing it. However, the State provided us with unsigned copies of the search warrant and the complaint for that search warrant which match the number of the search warrant in this case, 02 SW 6114. Because these documents are not signed, defense counsel on appeal responded that he had "no basis upon which to conclude that [they] are the authentic search warrant and complaint for search warrant." This unsigned warrant specifically authorized the officers to search Terrance Carter, a black, 35-year-old male, and the premises of 6646 S. Bell, and to seize the following materials: "Cocaine, to wit a controlled substance, and any other controlled substance, any documents showing residency. Any paraphernalia used in weighing, cutting, or mixing of illegal drugs. Any money or records detailing illegal drug transactions. Any firearms or firearm ammunition." In the complaint for this search warrant, Officer Ladd stated that he spoke with John Doe, who had purchased narcotics from Carter, and who had been present at 6646 S. Bell when several individuals came to the door and asked Carter for narcotics. Carter would then go to a back room and return with a plastic bag containing suspected crack cocaine and hand it to the

search warrant for apartment number 1 at 6338 South Laflin[2] Street in Chicago and the persons of Terrance Carter and Tamango Jackson.

When Officer Ladd entered the Bell Street residence, he found defendant and two other individuals inside. Defendant was located near the rear of the house. Ladd testified that he and the other officers handcuffed all three individuals for "our safety and safety of the entry team" and "to make sure that they [did] not interfere with the search warrant being executed." Ladd stated that defendant was "merely held for safety" and that he would not have allowed defendant to leave. While detaining defendant, Officer Ladd learned defendant's name and date of birth. Ladd then entered this information into a computer terminal in a squad car "to determine if they had any outstanding warrants, if they were clear," and discovered that there was an outstanding warrant for defendant's arrest for possession of a controlled substance in Whiteside County, Illinois.

After Ladd learned of this outstanding warrant, he spoke by radio to Officer Lidio Traverso, who was executing the search warrant at the Laflin residence. Traverso told Ladd that he had found a Minnesota state identification with defendant's name on it in proximity to a loaded .380-semiautomatic pistol in a bedroom at the Laflin house. Ladd then arrested defendant pursuant to the Whiteside County warrant and brought him to the police station. Ladd testified that the basis of his arrest of defendant was this outstanding warrant and not the gun recovered from the Laflin house.

On redirect examination, Officer Ladd admitted that the arrest report he authored indicated that the Laflin Street address was defendant's residence and that after the officers found the gun, they located defendant where he was taken into custody. The report also stated that further investigation revealed that defendant was a convicted felon. Officer Ladd testified, however, that at the time he ar-

---

individuals in exchange for money. Doe also saw an open cupboard in the kitchen containing numerous bags of cocaine. Doe also told Ladd that he saw a bluesteel Mac 11 machine pistol and several weapons inside the rear room at 6646 S. Bell, which Carter said he had for "protection." On January 2, 2002, Doe was present at that house when Carter sold an individual an ounce of cocaine. On January 3, 2002, Doe took Ladd to the Bell residence and showed him the house where Carter resided. The complaint also stated that Carter had been arrested three times for possession of a controlled substance and was currently on bond for the manufacture and delivery of a controlled substance.

[2]The trial transcript incorrectly refers to this street as "Laughlin." The common law record correctly identifies it as "Laflin" and it will be so designated in this opinion.

rested defendant, he knew that defendant was a convicted felon and that there was an outstanding warrant for his arrest.

The trial court then denied defendant's motion to suppress. At trial, Officer Traverso testified that on the day of defendant's arrest, he and eight other officers executed a search warrant in the first-floor apartment at 6338 South Laflin Street. In the rear bedroom of the apartment, Traverso recovered a loaded semiautomatic pistol on a shelf in the closet. He also found a Minnesota state identification card on a nightstand less than five feet away from the weapon. Traverso further testified that he was in radio contact with the officers executing the search warrant at the Bell Street address and that he spoke to Officer Ladd.

After speaking to Ladd, Officer Traverso took the gun and identification to the station to be inventoried. There, he advised defendant of his *Miranda* rights, and defendant acknowledged that he understood those warnings and agreed to talk to him. Officer Traverso showed defendant the gun and the identification card he had recovered. Defendant admitted that the gun was his, that he was aware the gun was kept in his bedroom at the Laflin residence, and that he had lived at that residence for several months. Defendant also indicated that the weapon was not operational.

The parties then stipulated to defendant's prior conviction for delivery of cocaine. The trial court found defendant guilty of unlawful use of a weapon by a felon. After denying defendant's motion for a new trial, the trial court sentenced him to two years' imprisonment. Defendant then filed this timely appeal.

Defendant contends that the trial court improperly denied his motion to quash arrest and suppress evidence where police officers unconstitutionally detained him while executing a search warrant. Defendant further argues that even if his initial detention was proper, Officer Ladd's act of running a warrant check on his name exceeded the scope of the detention.

■ "In reviewing a circuit court's ruling on a motion to suppress, mixed questions of law and fact are presented." *People v. Pitman*, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100 (2004). First, we uphold the trial court's findings of historical fact unless such findings are against the manifest weight of the evidence. *Pitman*, 211 Ill. 2d at 512, 813 N.E.2d at 100. The trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. *Pitman*, 211 Ill. 2d at 512, 813 N.E.2d at 101. However, this court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.

*Pitman,* 211 Ill. 2d at 512, 813 N.E.2d at 101. Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed. *Pitman,* 211 Ill. 2d at 512, 813 N.E.2d at 101. Additionally, the defendant bears the burden of proof at a hearing on a motion to suppress. *People v. Gipson,* 203 Ill. 2d 298, 306, 786 N.E.2d 540, 545 (2003).

The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The central inquiry under the fourth amendment is " 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Michigan v. Summers,* 452 U.S. 692, 700 n.11, 69 L. Ed. 2d 340, 348 n.11, 101 S. Ct. 2587, 2593 n.11 (1981), quoting *Terry v. Ohio,* 392 U.S. 1, 19, 20 L. Ed. 2d 889, 904, 88 S. Ct. 1868, 1878-79 (1968).

In assessing the validity of defendant's initial detention, we note first that it unquestionably constituted a "seizure" within the meaning of the fourth amendment. The record demonstrates that defendant was detained and handcuffed, and Ladd testified that defendant would not have been free to leave. See *Summers,* 452 U.S. at 696, 69 L. Ed. 2d at 345, 101 S. Ct. at 2590-91. The issue then becomes whether this seizure was reasonable.

Defendant argues that *Michigan v. Summers,* 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), does not apply to justify his seizure in this case. He asserts that *Summers* applies only to "occupants" of the premises and that defendant was not an occupant of the Bell Street residence. In its initial brief, the State failed to address the application of *Summers.* However, after this court issued an order requiring the State to file a supplemental brief addressing this issue, the State responded and now contends that *Summers* should apply to nonoccupants in this case. A thorough discussion of *Summers* is essential to the disposition of this case.

In *Summers,* the police were about to execute a warrant to search a house for narcotics when they encountered the defendant descending the front steps. The officers requested his assistance in gaining entry and detained him while they searched the premises. The officers also detained "the eight occupants of the house." *Summers,* 452 U.S. at 693 n.1, 69 L. Ed. 2d at 344 n.1, 101 S. Ct. at 2589 n.1. After finding narcotics in the basement and learning that the defendant owned the house, they arrested him, searched him and found heroin in his pocket. The issue in the case was whether his initial detention violated the fourth amendment. The Court first determined that the defendant had been "seized" under the fourth amendment when the police

detained him and that that detention was unsupported by probable cause. *Summers*, 452 U.S. at 696, 69 L. Ed. 2d at 345, 101 S. Ct. at 2590-91. The Court noted the general rule that every arrest, and every seizure with the indicia of a formal arrest, requires probable cause. This rule is tempered, however, by the "ultimate standard of reasonableness embodied in the Fourth Amendment." *Summers*, 452 U.S. at 699-700, 69 L. Ed. 2d at 348, 101 S. Ct. at 2593. Thus, some seizures "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Summers*, 452 U.S. at 699, 69 L. Ed. 2d at 348, 101 S. Ct. at 2592-93. The exception for limited intrusions that may be justified by special law enforcement interests is not confined only to the "momentary, on-the-street detention" such as that involved in *Terry*. *Summers*, 452 U.S. at 700, 69 L. Ed. 2d at 348, 101 S. Ct. at 2593. In order to decide if the facts in *Summers* were controlled by the general rule requiring probable cause, the Court held that it was "necessary to examine both the character of the official intrusion and its justification." *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 348-49, 101 S. Ct. at 2593.

The Court found the detention substantially less intrusive than an arrest for three reasons. First, of "prime importance" in assessing the intrusion was the fact that the police had a warrant to search the defendant's house for contraband because "[a] neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there." *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 349, 101 S. Ct. at 2593. The Court determined that the detention of a resident during a search of the premises, although admittedly a significant restraint on his liberty, was less intrusive than the search itself. Second, the type of detention imposed was not likely to be exploited by the officers or unduly prolonged in order to gain more information because the officers were primarily seeking information from the search itself and not the detention. *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594. Lastly, the detention was inside the defendant's home instead of in a police station, thereby minimizing the public stigma associated with the event and involving "neither the inconvenience nor the indignity" associated with a compelled visit to the station. *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594.

In comparison, in assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a

valid warrant, the Court noted that both the law enforcement interest and the nature of the articulable facts supporting the detention were relevant. *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594. The Court identified three law enforcement interests, all of which supported the detention at issue: (1) preventing flight in the event that incriminating evidence is found; (2) minimizing the risk of harm to the police and occupants if the officers routinely exercised unquestioned command of the situation; and (3) facilitating the orderly completion of the search by having the occupant of the premises present to open locked doors or containers to avoid the use of force which damaged the property and could delay completion of the search. *Summers*, 452 U.S. at 702-03, 69 L. Ed. 2d at 349-50, 101 S. Ct. at 2594.

■ The Court then considered the nature of the articulable and individualized suspicion on which the police based the detention of the occupant of a home already subject to a search warrant. The Court found that the existence of a valid search warrant, issued by a neutral magistrate to search a home for criminal activity, established probable cause that "someone in the home" was committing a crime, which in turn provided an objective justification for detaining the home's occupant. *Summers*, 452 U.S. at 703, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Summers*, 452 U.S. at 703-04, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594-95. The Court then held, "Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705, 69 L. Ed. 2d at 351, 101 S. Ct. at 2595.

The Supreme Court next addressed this issue in *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005). In *Muehler*, the respondent brought an action under section 1983 of the Civil Rights Act of 1984 (42 U.S.C. § 1983 (2000)) against several officers who executed a search warrant of the premises she occupied for deadly weapons and evidence of gang membership. The respondent was asleep when a SWAT team entered her bedroom, placed her in handcuffs at gunpoint, and took her, along with three other handcuffed individuals found on the premises, to a converted garage. While the search proceeded, one or two officers guarded the four detainees, who remained in handcuffs. *Muehler*, 544 U.S. at 95-96, 161 L. Ed. 2d at 305, 125 S. Ct. at 1468. Aware that the particular gang involved was composed primarily of illegal immigrants, the officers notified the Im-

migration and Naturalization Service (INS), and an INS officer accompanied the police executing the warrant. During the two- to three-hour detention in the garage, an officer asked for each detainee's name, date and place of birth, and immigration status, and the INS officer asked the detainees for their immigration documentation. *Muehler*, 544 U.S. at 96, 161 L. Ed. 2d at 305, 125 S. Ct. at 1468. The respondent was a permanent resident. While the search of the premises yielded narcotics, weapons, ammunition, and gang paraphernalia, the respondent was released before the officers left the premises. *Muehler*, 544 U.S. at 97, 161 L. Ed. 2d at 306, 125 S. Ct. at 1469. The Court found that such a detention for the duration of the search was "plainly permissible" under *Summers* because a warrant existed to search the premises and she was an occupant of that house. *Muehler*, 544 U.S. at 98, 161 L. Ed. 2d at 307, 125 S. Ct. at 1470.

The Court also found the officers' use of handcuffs to effectuate the respondent's detention reasonable because the governmental interests outweighed the marginal intrusion. *Muehler*, 544 U.S. at 99, 161 L. Ed. 2d at 307, 125 S. Ct. at 1470. The imposition of handcuffs on the respondent, who was already being lawfully detained during a search of the house, was a separate intrusion in addition to the detention in the converted garage, making this detention more intrusive than the detention in *Summers*. However, the Court reasoned, this was "no ordinary search" and found:

> "In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants. [Citation.] Though this safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable." *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471.

The Court then addressed the respondent's argument that, even if the initial use of handcuffs was reasonable, the duration of the use of handcuffs made the detention unreasonable. The Court acknowledged that the duration of a detention could, "of course," affect the balance of the nature and quality of the intrusion on the person's fourth amendment interests against the countervailing governmental interests at stake. *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471, citing *Graham v. Connor*, 490 U.S. 386, 396, 104 L. Ed. 2d 443, 455, 109 S. Ct. 1865, 1871 (1989). However, the Court found that the respondent's two- to three-hour detention in handcuffs did not outweigh the government's continuing safety interests where the case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons. *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471.

Next, the *Muehler* Court considered the respondent's claim that the officers violated her fourth amendment rights by questioning her about her immigration status. The Court rejected this argument, repeating its holding that " 'mere police questioning does not constitute a seizure.' " *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471, quoting *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991). Thus, the Court found that the questioning of respondent did not constitute another seizure within the meaning of the fourth amendment and the officers did not need reasonable suspicion to ask her name, date and place of birth, or immigration status. *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471. Because the initial *Summers* detention was lawful and the court of appeals did not find that the questioning of the respondent extended the time she was detained, no additional fourth amendment justification for inquiring about her immigration status was required. *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 309, 125 S. Ct. at 1471-72. Thus, the Court held that the detention, use of handcuffs, and questioning of the respondent did not violate the fourth amendment. *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471.

As discussed above, the holding in *Summers*, and as applied in *Muehler*, is that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705, 69 L. Ed. 2d at 351, 101 S. Ct. at 2595. First, we note that *Summers* never held that this rule applied **only** to occupants. Rather, *Summers* is narrowly tailored to the facts before that Court where that defendant was a resident of the house. The Court did not have reason to address this issue in *Muehler* because the respondent was also a resident of the house that was searched. Thus, the United States Supreme Court has not yet had the occasion to address the specific application of *Summers* to nonresidents.

Because *Summers* used the term "occupant" interchangeably with "resident," without defining either term, courts have debated the meaning of "occupant." Defendant urges us to follow the Second and Fourth Districts of this court which, he contends, held that only a resident of a dwelling is an "occupant." Based on these cases, defendant argues, we should conclude that *Summers* does not apply to justify defendant's detention in this case because defendant was not a resident of the Bell Street house.[3]

The Second and Fourth Districts of the Illinois Appellate Court

---

[3]Additionally, defendant cites *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d

have addressed the meaning of the term "occupant" as it is used in *Summers*. See *People v. Hess*, 314 Ill. App. 3d 306, 310, 732 N.E.2d 674, 677 (4th Dist. 2000); *People v. Elliot*, 314 Ill. App. 3d 187, 192, 732 N.E.2d 30, 35 (2d Dist. 2000). In doing so, those courts follow a statement of Professor LaFave. In his treatise, LaFave discussed *Summers* and reasoned that, "Especially because the Court elsewhere refers to the category of persons covered as 'residents' who would ordinarily 'remain in order to observe the search of their possessions,' it would seem that the word 'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally." 2 W. LaFave, Search & Seizure § 4.9(e), at 726-27 (4th ed. 2004), quoting *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 349, 101 S. Ct. at 2593. Based mainly on this sentence, the *Elliot* court found that the police could not effect a *Summers* detention on a nonresident. See *Elliot*, 314 Ill. App. 3d at 192, 732 N.E.2d at 35.

However, the *Elliot* and *Hess* courts' citation to LaFave is merely *dicta*. In *Hess*, that defendant did not contend that his initial detention was unlawful, but argued only that its length exceeded constitutional bounds. *Hess*, 314 Ill. App. 3d at 311, 732 N.E.2d at 677. In fact, despite its citation to LaFave and apparent holding that *Summers* applies only to residents, the *Hess* court actually agreed with the State that "[t]he police must be free to exercise their discretion to control the environment when facing dangerous circumstances, such as the execution of the search warrant in this case," and found that the police did have the authority to detain defendant, a nonresident, but then held that the police had no justification to continue to detain

238, 100 S. Ct. 338 (1979), in support of his argument that his detention was illegal. However, the *Summers* Court cautioned against this use of *Ybarra* by stating that the " 'seizure' issue in this case should not be confused with the 'search' issue presented" in *Ybarra*. *Summers*, 452 U.S. at 695 n.4, 69 L. Ed. 2d at 345 n.4, 101 S. Ct. at 2590 n.4. The Court in *Ybarra* considered only whether a pat-down search of all customers present during the execution of a search warrant at a tavern was permissible. No question concerning the legitimacy of the detention was raised. *Summers*, 452 U.S. at 695 n.4, 69 L. Ed. 2d at 345 n.4, 101 S. Ct. at 2590 n.4. In this case, as in *Summers*, only defendant's detention is at issue. Additionally, there is no evidence in this record indicating that defendant was searched. Therefore, *Ybarra* does not apply. Defendant's citations to *People v. Coats*, 269 Ill. App. 3d 1008, 647 N.E.2d 1088 (1995), *People v. Gross*, 124 Ill. App. 3d 1036, 465 N.E.2d 119 (1984), and *People v. Redmiles*, 191 Ill. App. 3d 198, 547 N.E.2d 724 (1989), are similarly inapplicable where they relied on *Ybarra* and concerned only whether the police could search a person after he had been detained during the execution of a search warrant and not the legality of the defendant's initial detentions.

him. *Hess*, 314 Ill. App. 3d at 312, 732 N.E.2d at 678. Further, although the *Elliot* court cited LaFave's analysis that only a resident could be detained under *Summers*, it ultimately held that defendant's status as a resident or nonresident was actually "irrelevant" where that defendant was subject to a custodial interrogation which was not permitted under *Summers*, regardless of defendant's residential status. *Elliot*, 314 Ill. App. 3d at 192, 732 N.E.2d at 35-36. Because that defendant's seizure required a fourth amendment basis independent of the officers' right to search the apartment, which the officers did not have, the *Elliot* court found that the custodial interrogation of the defendant was unconstitutional. *Elliot*, 314 Ill. App. 3d at 192, 732 N.E.2d at 35-36. See also *People v. Kilfoy*, 122 Ill. App. 3d 276, 287-88, 466 N.E.2d 250, 258-59 (2d Dist. 1984) (discussing LaFave's statement in *dicta*, but not applying it because the defendant resided at the house subject to the search warrant and the issue was not the legality of defendant's initial detention under the fourth amendment, but whether defendant was subject to custodial interrogation such that the officers should have given her *Miranda* warnings under the fifth amendment). Accordingly, no court in Illinois has strictly adopted LaFave's statement or held that *Summers* applies only to residents of the premises listed in the search warrant.

Several other courts have considered the application of *Summers* to nonresidents. These cases do not enter into the debate of the correct definition of "occupant" or what the Supreme Court meant by using that term in *Summers*. Rather, these cases go beyond the mere definition of the term and look at the analysis and reasoning used by the *Summers* Court. These courts apply that analysis to the facts of each of their cases to determine if the *Summers* holding should also apply to allow the detention of nonresidents who were present during the execution of a valid search warrant. See, *e.g.*, *Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002); *United States v. Bohannon*, 225 F.3d 615, 617 (6th Cir. 2000); *United States v. Fountain*, 2 F.3d 656, 661-64 (6th Cir. 1993), *cert. denied sub nom. McEaddy v. United States*, 510 U.S. 1014, 126 L. Ed. 2d 573, 114 S. Ct. 608 (1993), *overruled on other grounds by Trepel v. Roadway Express, Inc.*, 194 F.3d 708 (6th Cir. 1999); *United States v. Pace*, 898 F.2d 1218, 1238-40 (7th Cir. 1990), *cert. denied sub nom. Cialoni v. United States*, 497 U.S. 1030, 111 L. Ed. 2d 795, 110 S. Ct. 3286 (1990), and *sub nom. Savides v. United States*, 498 U.S. 878, 112 L. Ed. 2d 170, 111 S. Ct. 210 (1990). See also *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003); *United States v. Vite-Espinoza*, 342 F.3d 462, 467 (6th Cir. 2003); *United States v. Johnson*, 170 F.3d 708, 717 (7th Cir. 1999); *State v. Vorburger*, 255 Wis. 2d 537, 557-70, 648 N.W.2d 829, 840-44 (2002) (applying *Summers* to nonresidents).

We find the Seventh Circuit's opinion in *United States v. Pace*, 898 F.2d 1218 (7th Cir. 1990), instructive. In *Pace*, the court acknowledged that, unlike in *Summers*, the defendants in *Pace* were not residents of the searched premises, but held that this distinction did not change the result. *Pace*, 898 F.2d at 1239. The *Pace* court applied the *Summers* analysis and balanced the nature of the intrusion against the governmental interests justifying it. The court then found that, as in *Summers*, the intrusions of the defendants' privacy interests were substantially less intrusive than arrests. *Pace*, 898 F.2d at 1239. The court also noted that the police merely detained the defendants to take control of the situation before searching and did not exploit the detentions to obtain information from them. Balanced against this intrusion were the governmental interests justifying the detention. *Pace*, 898 F.2d at 1239. The court emphasized the fact that a neutral magistrate had found probable cause to believe that the premises contained evidence of illegal gambling activities and the defendants' presence in those premises gave the police " 'an easily identifiable and certain basis' " for detaining them during the search. *Pace*, 898 F.2d at 1239, quoting *Summers*, 452 U.S. at 704, 69 L. Ed. 2d at 350, 101 S. Ct. at 2595. It was reasonable for the police to assume that people in the apartment would be armed or have access to weapons, giving the police valid interests in their own safety and in preventing the possible flight of the defendants if they were involved. *Pace*, 898 F.2d at 1239. Based on this balancing test, the *Pace* court held that it was reasonable for the police to protect themselves and assure that the search proceeded smoothly by detaining the defendants during the execution of the search, despite the fact that they were not residents of the premises. *Pace*, 898 F.2d at 1239. See also *Bohannon*, 225 F.3d at 616-17 (explaining that many of the rationales underlying *Summers*, the prevention of flight if incriminating evidence was found and the minimization of risk of harm to the officers, were also present in the detention of nonresidents); *Fountain*, 2 F.3d at 662-64 (applying the *Summers* analysis in holding that *Summers* includes nonresidents of the searched premises).

Similarly, we will apply the *Summers* analysis to the facts of our case, as did the Sixth and Seventh Circuits in *Fountain* and *Pace*, to determine if the detention of defendant, a nonresident of the Bell Street residence, during the execution of a search warrant for narcotics was reasonable under the fourth amendment.

First, we must balance the nature of the intrusion against the governmental interests justifying it. *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 349, 101 S. Ct. at 2593. Here, the police had a warrant to search the premises of 6646 South Bell for narcotics. Thus, a neutral

magistrate had found probable cause to believe that the law was being violated at that house and had authorized a substantial invasion of privacy of the persons living there. *Summers*, 452 U.S. at 701, 69 L. Ed. 2d at 349, 101 S. Ct. at 2593. The intrusion on defendant's privacy, while not trivial, was still " 'substantially less intrusive' than an arrest." *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594, citing *Dunaway v. New York*, 442 U.S. 200, 210, 60 L. Ed. 2d 824, 834, 99 S. Ct. 2248, 2255 (1979). In this case, the police merely detained defendant to take control of the situation before conducting the search of the premises. See *Pace*, 898 F.2d at 1239. Moreover, the police did not exploit the detention or unduly prolong it to obtain information from defendant and did not search him during the execution of the search warrant. Further, the record does not suggest that defendant was detained at gunpoint, which tends to reduce the intrusiveness of the detention. Additionally, while this detention did not take place in defendant's own residence, it nevertheless falls within *Summers* because it took place inside a private residence and not at a police station and, thus, did not involve either "the inconvenience [or] the indignity associated with a compelled visit to the police station." *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594.

Next, we consider the governmental interests justifying this detention. The existence of a search warrant for the Bell Street residence provides an objective justification for the detention. See *Summers*, 452 U.S. at 703, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. When issuing this search warrant for contraband, a judicial officer determined that police had probable cause to believe that "someone in the home is committing a crime." *Summers*, 452 U.S. at 703, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. Although defendant was not a resident of the Bell Street house, it is nevertheless significant that he was present in a house that a neutral magistrate had found probable cause to believe contained narcotics. See *Pace*, 898 F.2d at 1239. Upon entering the house, the police could not be sure if defendant was connected to this illegal activity or if he was a resident of the house. His presence indicated that he voluntarily connected himself to this house and its occupants and that he was not merely an innocent bystander. *Vorburger*, 648 N.W.2d at 841. As in *Summers*, defendant's connection to that home gave the officers "an easily identifiable and certain basis for determining that suspicion of criminal activity justifies [his] detention." *Summers*, 452 U.S. at 704, 69 L. Ed. 2d at 350, 101 S. Ct. at 2595. Additionally, in this case, there is a legitimate law enforcement interest in preventing flight in the event incriminating evidence was found where the police had reason to believe that by connecting himself to this house, defendant could be involved in criminal activity.

See *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349, 101 S. Ct. at 2594. Further, Ladd testified that he held defendant partly to prevent him from interfering with the execution of the search warrant.

Next, the police had a valid law enforcement interest in minimizing the risk of harm to the officers. *Summers*, 452 U.S. at 702-03, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. Here, Officer Ladd testified that he detained defendant and the other individuals for the officers' safety. As in *Summers*, "Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Summers*, 452 U.S. at 702, 69 L. Ed. 2d at 349-50, 101 S. Ct. at 2594. When the officers entered the Bell Street residence to search for narcotics, they faced a confined, unfamiliar environment that was likely to be dangerous. See *Fountain*, 2 F.3d at 663. Concern for the safety of the agents and the need to prevent disposal of any narcotics on the premises justified restraining defendant and the other individuals present. These concerns are the same regardless of whether the individuals present in the home being searched were residents or visitors. See *Fountain*, 2 F.3d at 663. The character of the intrusion on defendant and its justification were reasonable and proportional to law enforcement's legitimate interests in preventing flight in the event that incriminating evidence was found and in minimizing the risk of harm to the officers. *Fountain*, 2 F.3d at 663.

The last justification used by the *Summers* Court is facilitating the orderly completion of the search if the occupants of the premises were present to open locked doors and containers to prevent damage to property. *Summers*, 452 U.S. at 703, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. Although that reason is not present when detaining nonoccupants, we find that this is not dispositive here. As discussed above, the intrusion on defendant here from a brief detention was slight and nearly every one of the law enforcement interests was present here.

Both *Summers* and *Muehler* emphasized that, "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler*, 544 U.S. at 98, 161 L. Ed. 2d at 307, 125 S. Ct. at 1470, quoting *Summers*, 452 U.S. at 705 n.19, 69 L. Ed. 2d at 351 n.19, 101 S. Ct. at 2595 n.19. Thus, after balancing all of these interests, we find it was reasonable for the police to protect themselves and assure that the search proceeded smoothly by detaining defendant, a nonresident, during the execution of a search warrant for narcotics at the Bell Street residence.

We find additional support for our holding in Justice Stevens'

concurrence in *Muehler*.[4] In that concurrence, which was joined by Justices Souter, Ginsburg and Breyer, Justice Stevens stated that *"Summers* authorizes the detention of *any individual* who is present when a valid search warrant is being executed." (Emphasis added.) *Muehler*, 544 U.S. at 105-06, 161 L. Ed. 2d at 311, 125 S. Ct. at 1474 (Stevens, J., concurring, joined by Souter, Ginsburg, and Breyer, JJ.). Although this concurrence is not binding precedent, it indicates that the Supreme Court in *Summers* meant to include not only residents, but also all other individuals present on the premises during the execution of a search warrant, such as defendant.

We next address whether Officer Ladd's use of handcuffs on defendant was justified under *Summers*. *Summers* noted that the risk of harm to both police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. *Summers*, 452 U.S. at 703, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. "Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98-99, 161 L. Ed. 2d at 307, 125 S. Ct. at 1470, citing *Graham*, 490 U.S. at 396, 104 L. Ed. 2d at 455, 109 S. Ct. at 1872. In "inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants." *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471. Additionally, the *Muehler* Court noted that the need to detain multiple occupants made the use of handcuffs "all the more reasonable." *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471, citing *Maryland v. Wilson*, 519 U.S. 408, 414, 137 L. Ed. 2d 41, 48, 117 S. Ct. 882, 886 (1997) (noting that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car").

Here, Officer Ladd detained three individuals inside the Bell Street residence and handcuffed all three during their detention for the safety of the police officers and to ensure that the individuals did not interfere with the search of the premises. As in *Muehler*, his need to detain several people during this search made the use of handcuffs reasonable. Moreover, the *Muehler* Court found that the use of handcuffs on that respondent for two to three hours to effectuate her detention was not unreasonable because the governmental interests outweighed the marginal intrusion on her interests. *Muehler*, 544 U.S. at 100, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471. In this case, Officer Ladd testified that he handcuffed defendant when he entered the house. This detention seemingly lasted only a few minutes while Ladd

---

[4]Justice Stevens also authored the majority opinion in *Summers*.

learned defendant's name and date of birth and checked this information through his computer, discovering defendant's outstanding warrant. During this detention, the officers continued to need to minimize the risk of harm to themselves. Thus, the use of handcuffs on defendant for only a few minutes did not outweigh the officers' continuing safety interests and was reasonable.

We next address Officer Ladd's questioning of defendant. First, it is unclear from the record how Officer Ladd obtained defendant's name and date of birth. He testified merely that he "learned" this information. Based on this testimony, it is unclear whether Ladd asked defendant for his name and date of birth or whether he obtained the information in another way, such as through another individual in the house. However, for the sake of this analysis, we will assume that Officer Ladd asked defendant these questions.

The United States Supreme Court has repeatedly held that " 'mere police questioning does not constitute a seizure.' " *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471, quoting *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386. See also *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1762 (1984) ("interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"). Officers may generally ask questions of an individual and ask to examine that person's identification, even without any basis to suspect that individual. *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471, citing *Bostick*, 501 U.S. at 434-35, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386. Additionally, the *Muehler* Court found that an INS officer's questioning of the respondent about her immigration status was merely routine questioning. *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 309, 125 S. Ct. at 1471-72.

Here, as discussed above, the initial detention of defendant was lawful under *Summers* and *Muehler*. We now find that asking defendant his name and date of birth did not impermissibly prolong this detention. See *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471. Based on the scant facts of our case, it is apparent that the detention, handcuffing, and questioning of defendant took only a few minutes. While there is no information in the record as to the length of the search of the Bell Street residence, it seems reasonable that the search of the premises and the person of Terrance Carter for narcotics lasted much longer than the few-minute detention of defendant. Because his detention was not prolonged by the questioning, there was no additional seizure of defendant within the meaning of the fourth amendment, and thus, the officers did not need reason-

able suspicion to ask defendant basic questions about his name and date of birth. *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471.

Lastly, we address Officer Ladd's act of conducting a warrant check by running defendant's name and date of birth through his squad car computer. First, we clarify that, contrary to the State's contention in its brief, Ladd did not take defendant to his squad car. Rather, when asked, "Did you do anything with that information [defendant's name and date of birth]?" Ladd answered, "That information was taken to one of the squad cars where a computer terminal was there. The names were run on the computer terminal." Thus, as defendant concedes, Ladd did not remove defendant from the premises to conduct the warrant check.

In support of his argument that this warrant check impermissibly changed the encounter from a protective detention while executing a search warrant into an investigation of past crimes, defendant relies primarily on *People v. Harris*, 207 Ill. 2d 515, 802 N.E.2d 219 (2003). In that case, our supreme court held that a warrant check of a passenger during a lawful traffic stop was impermissible because it changed the fundamental nature of the stop, making the detention unreasonable. *Harris*, 207 Ill. 2d at 528, 534, 802 N.E.2d at 228, 231. However, the United States Supreme Court recently vacated the decision in *Harris* and remanded the case to the Illinois Supreme Court in light of *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). *Illinois v. Harris*, 543 U.S. 1135, 161 L. Ed. 2d 94, 125 S. Ct. 1292 (2005). Therefore, we cannot consider *Harris* or its progeny. Defendant also cites *People v. Torres*, 347 Ill. App. 3d 252, 807 N.E.2d 654 (2004), which relies exclusively on *Harris* for its holding that the warrant check of a passenger was unreasonable. In light of the fact that the United States Supreme Court vacated *Harris*, we find *Torres'* holding questionable and similarly decline to follow it.

Rather, we look to *Muehler* and *Caballes* to determine the reasonableness of this warrant check. Both cases recognized that a "lawful seizure 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.' " *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 309, 125 S. Ct. at 1471, quoting *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. Here, as discussed above, defendant's initial *Summers* detention was lawful. Based on our record, it is clear that Officer Ladd's act of detaining defendant, questioning him and conducting the warrant check took only a few minutes and was completed before the officers finished their search of the premises and Terrance Carter. Thus, the warrant check did not impermissibly prolong defendant's lawful detention and

Ladd did not need an additional fourth amendment justification for this warrant check. See *Muehler*, 544 U.S. at 101, 161 L. Ed. 2d at 308-09, 125 S. Ct. at 1471-72. See also *Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837 (rejecting the notion that "the shift in purpose" "from a lawful traffic stop into a drug investigation" was unlawful because it "was not supported by any reasonable suspicion").

After conducting the warrant check, Officer Ladd discovered a valid outstanding warrant for defendant's arrest. At this point, defendant's *Summers* detention turned into a proper arrest based on that warrant. Thus, defendant's continued detention and his subsequent confession at the police station were valid under the fourth amendment.

■ Therefore, we find that the police officers' detention of defendant, a nonresident, in handcuffs for a few minutes during the execution of the search warrant for narcotics at the premises was reasonable and did not violate the fourth amendment. Additionally, the officers' questioning of him and warrant check did not constitute an independent fourth amendment violation or unconstitutionally prolong defendant's lawful *Summers* detention. Accordingly, the trial court properly denied defendant's motion to quash his arrest and suppress evidence. For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

REID, P.J., and GREIMAN, J., concur.